**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| JAMES DALE,<br><br>  *Plaintiff*,<br><br>    v.<br><br>DEPARTMENT OF DEFENSE,<br><br>  *Defendant*. | Case No. 26-CV-5367<br><br>**COMPLAINT** |

## INTRODUCTION

1. This is an action under the Freedom of Information Act to compel the Department of Defense to disclose a single agency record: a final, signed Memorandum of Understanding between the Department and Scouting America, executed on or about February 27, 2026.

2. The two signatories have given contradictory accounts of what the Memorandum requires.  The Department says that in the Memorandum, Scouting America agreed to make sweeping changes to its policies on gender identity, sex designation, and program access. Scouting America says its membership policies will not change and that transgender youth remain welcome.

3. Both accounts cannot be true, and the stakes are of profound public importance. The dispute implicates the same question of expressive association—and, indeed, the same association—at the heart of the landmark *Boy Scouts of America v. Dale*.  There, the Supreme Court held that the government could not require the Scouts to accept Mr. Dale (the Plaintiff in this case) as a member because the organization possessed a constitutional right to make choices about its own membership.  Here, if the Department's account is true, the federal government has now obtained by contract what the Court once held it could not command by law.  And if it is

1

not, then the Department has misled the public about what Scouting America has agreed to do. Either way, only the text of the Memorandum can settle the matter.

4.    That question is time-sensitive because the Memorandum is currently being implemented, and because the Department has made future support contingent on whether Scouting America makes "substantial progress" toward the Memorandum's terms, with a six-month review scheduled for August 2026.

5.    Mr. Dale requested the Memorandum on March 24, 2026.  The Department has invoked no exemption, produced no record, and missed every deadline.  Mr. Dale brings this action to enforce the public's right to know, before the Department's August deadline expires.

**PARTIES**

6.    Plaintiff James Dale is a citizen of New York and a resident of Manhattan, in its Southern District.  He is the requester of the record at issue in this case.

7.    Mr. Dale is a writer, speaker, and public commentator on issues of LGBTQ equality.

8.    Mr. Dale's connection to Scouting spans nearly five decades.  He joined as a Cub Scout in 1978, and in 1988, he achieved the rank of Eagle Scout, one of Scouting's highest honors.  In 1990, at the age of nineteen, Mr. Dale was expelled from the Boy Scouts for being openly gay.  A decade later, the Supreme Court decided the landmark case bearing his name. *See Boy Scouts of America v. Dale*, 530 U.S. 640 (2000).

2

9.     Mr. Dale has been a key participant in the public debate that has ensued.  His commentary has been featured in national media outlets including *The New York Times*,[1] *The Los Angeles Times*,[2] *The Washington Post*,[3] and *Time Magazine*.[4]

10.     Mr. Dale maintains an active personal website and writing archive at jamesrdale.com, has published a digital newsletter sent directly to subscribers, and continues to publish in national media outlets about the federal activities and operational policy shifts at issue in this action.  His recent bylined publications include a March 2026 essay in *Time Magazine*,[5] a May 2026 essay in *Prism & Pen*,[6] and several other essays published directly to his website.[7]

11.     Mr. Dale seeks the document at issue here strictly in his capacity as a writer and commentator, and he intends to use it to inform the public about the precise nature of the Department's agreement with Scouting America.

---

[1] *See* James Dale, *The Boy Scouts Can Do a Good Turn Finally*, N.Y. Times (May 19, 2017), https://www.nytimes.com/2017/05/19/opinion/the-boy-scouts-can-do-a-good-turn-finally.html; James Dale, *Boy Scouts' Discrimination Is Killing the Organization*, N.Y. Times (July 19, 2012), https://www.nytimes.com/roomfordebate/2012/07/19/why-do-the-boy-scouts-exclude-gays/boy-scouts-discrimination-is-killing-the-organization.

[2] *See* James Dale, *Scouting's Misstep*, L.A. Times (May 22, 2013), https://www.latimes.com/opinion/la-xpm-2013-may-22-la-oe-dale-boy-scouts-20130522-story.html.

[3] *See* James Dale, *Why Did I Challenge the Boy Scouts' Anti-Gay Policy? Because I Am a Loyal Scout*, Wash. Post (Feb. 8, 2013), https://www.washingtonpost.com/opinions/why-did-i-challenge-the-boy-scouts-anti-gay-policy-because-i-am-a-loyal-scout/2013/02/08/346ebab2-7159-11e2-a050-b83a7b35c4b5_story.html.

[4] *See, e.g.*, James Dale, *I Am a Gay Boy Scout: The Policies Remain Wrong*, Time (May 22, 2015), https://time.com/3893394/boy-scouts-policy-remains-wrong/.

[5] James Dale, *SCOTUS Protected the Scouts' Right to Exclude Me–and Their Right to Be Inclusive*, Time (Mar. 26, 2026), https://time.com/article/2026/03/26/scotus-protected-scouts-right-to-exclude-me-and-their-right-to-be-inclusive-/.

[6] James Dale, *He Said, "Over My Dead Body."  I'm the Gay Boy Scout Who Finally Went Back.*, Prism & Pen (May 28, 2026), https://medium.com/prismnpen/over-my-dead-body-gay-boy-scout-went-back-af347e205bf3.

[7] *See, e.g.*, James Dale, *Hegseth Calls It "Woke."  I Call It Scouting.*, Substack (Apr. 30, 2026), https://jamesrdale.substack.com/p/hegseth-calls-it-woke-i-call-it-scouting; James Dale, *The Script Never Changes*, Substack (Mar. 18, 2026), https://jamesrdale.substack.com/p/the-script-never-changes.

12.     Defendant, the Department of Defense, is a department of the executive branch of the United States government, 10 U.S.C. § 111(a), and an "agency" within the meaning of FOIA, 5 U.S.C. § 552(f)(1).[8]  The Department has possession and control of the record Mr. Dale seeks.

## JURISDICTION AND VENUE

13.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 552(a)(4)(B).

14.     Venue is proper under 5 U.S.C. § 552(a)(4)(B) because Mr. Dale resides in this district.

## FACTS

15.     Scouting America (formerly the Boy Scouts of America) is a national youth organization with more than a million youth members.  Its stated mission is to "prepare young people to make ethical and moral choices over their lifetimes by instilling in them the values of the Scout Oath and Law."

16.     In 1990, Scouting America expelled the Plaintiff, James Dale, an Eagle Scout and assistant scoutmaster, from the organization because he was openly gay.  Following the Supreme Court's decision in 2000 in *Boy Scouts v. Dale*, which ruled in favor of the Scouts, "corporate and governmental support for the organization . . . slipped markedly."  Kate Zernike, *Scouts' Successful Ban on Gays Is Followed by Loss in Support*, N.Y. Times (Aug. 29, 2000).[9]

17.     Since then, Scouting America has adopted a more inclusive approach to its membership.  In 2013, the organization voted to end its ban on openly gay youth members,

---

[8] Since September 2025, the Department has sometimes gone by the moniker "Department of War," *see* Exec. Order No. 14,347, § 2(e), 90 Fed. Reg. 43,893 (Sept. 5, 2025), including in many of the documents cited by this Complaint.  By federal statute, of course, the agency's formal name remains the "Department of Defense."  *See* 10 U.S.C. § 111(a) ("The Department of Defense is an executive department.").

[9] www.nytimes.com/library/national/082900scouts-contribute.html.

effective 2014.  In 2015, it lifted its ban on openly gay adult leaders.  In 2017, it began accepting

transgender youth.  And in 2018 and 2019, it expanded its membership to include girls.  *See*

*generally* Scouting America Membership Standards, Scouting America,

https://www.scouting.org/about/membership-standards (last visited June 25, 2026).

### *Defendant's Memorandum of Understanding*

18.     In late 2025, the Department began publicly targeting Scouting America for its

inclusive membership policies.  On November 25, 2025, NPR reported that the Department was

preparing directives to sever its historic, century-long operational relationship with Scouting

America because of those policies.  *See* Graham Smith & Tom Bowman, *U.S. Ready to Cut*

*Support to Scouts, Accusing Them of Attacking 'Boy-Friendly Spaces,'* NPR (Nov. 25, 2025).[10]

19.     In early February 2026, senior Department officials went public with their threats.

On February 3, 2026, a Department spokesperson publicly warned Scouting America that it must

"rapidly implement[ ]" necessary reforms to its membership policies, that it was "on the clock,"

and that the Department was "watching."  *See* Stephen Sorace, *Scouting America 'On the Clock'*

*to Roll Back DEI, War Dept Says*, Fox News (Feb. 3, 2026).[11]

20.     The Department's public threats were yoked to immediate, severe operational

consequences.  Withdrawing federal support would severely disrupt the National Scout

Jamboree, Scouting America's quadrennial flagship event, which relied heavily on military

personnel and infrastructure for medical care, transportation, security, and emergency services.

Withdrawing federal support would also mean an end to the longstanding policy allowing Scout

---

[10] https://www.npr.org/2025/11/25/nx-s1-5615164/pentagon-scouting-hegseth-cut-ties.
[11] https://www.foxnews.com/politics/scouting-america-on-clock-roll-back-dei-war-dept-says.

troops to use military base facilities here and abroad. *See* Chris Cameron, *Scouts Will Abandon D.E.I. Policies Under Agreement with Pentagon, Hegseth Says*, N.Y. Times (Feb. 27, 2026).[12]

21.    On or about February 27, 2026, the Department and Scouting America executed a Memorandum of Understanding concerning Scouting America's membership policies, related program changes, and the terms of continued federal support for the organization.

22.    The Department announced the Memorandum on February 27, 2026, through official channels.  In a video statement released that day, Secretary Hegseth declared that "the Department of War ha[d] officially put Scouting America on notice."  Pete Hegseth (@SecWar), X (Feb. 27, 2026), https://x.com/SecWar/status/2027369564531818827.

23.    The same day, the Department published an article on war.gov announcing a "memorandum of understanding for partnership and policy alignment" with Scouting America. The article stated that continued federal support for Scouting America was conditioned on the organization's commitment to "key reforms" outlined in the Memorandum.  Matthew Olay, *Hegseth Says Scouting America Support to Continue upon Org's Commitment to Drop DEI*, U.S. Dep't of War (Feb. 27, 2026).[13]

24.    According to the Department's article, the Memorandum itself states that Scouting America membership applications will continue to provide only "male" and "female" sex designations, and that Scouting America will enact a policy barring "biological boys and biological girls" from sharing intimate spaces including "toilets, showers and tents."  *Id.*  The article further stated that similar policies would apply to scout leaders, volunteers, staff, and other individuals involved with the organization.  *See id.*

---

[12] https://www.nytimes.com/2026/02/27/us/politics/scouting-america-dei-pentagon-hegseth.html.
[13] https://www.war.gov/News/News-Stories/Article/Article/4417012/hegseth-says-scouting-america-support-to-continue-upon-orgs-commitment-to-drop.

25.     The Department's article also described additional terms of the Memorandum, including the discontinuance of a diversity, equity, and inclusion-themed merit badge; the dissolution of Scouting America's diversity committee; registration-fee waivers for military families; a new military-service merit badge developed in partnership with the Pentagon; a Department-appointed liaison to keep regular communications open and coordinate matters related to the Memorandum; and continued access to U.S. military installations for Scouting activities.  *See id.*

26.     In the accompanying video, Secretary Hegseth framed the Memorandum as a correction to Scouting America's recent evolution.  He criticized Scouting America as "an organization that no longer supported and celebrated boys" and identified the organization's membership and inclusion policies as the problem: "Diversity, equity, and inclusion, DEI, crept in.  The name was changed to Scouting America.  Girls were accepted."  Pete Hegseth (@SecWar), X (Feb. 27, 2026).

27.     Secretary Hegseth then announced that Scouting America had "agreed to make several key reforms."  *Id.*  He stated that Scouting America would "modify its policy to make clear that membership will be based solely on biological sex at birth and not gender identity," and that "the application, any application," would have only two sex designations, "male and female," which "must match the applicant's birth certificate."  *Id.*

28.     Secretary Hegseth warned that future federal support was "contingent on [Scouting America] making substantial progress toward reaching these and many other positive changes in the next six months."  *Id.*  If the Department was unsatisfied after six months, he stated, it would find Scouting America "in violation of the President's executive order and cease our support."  *Id.*  He closed by making the Department's continuing oversight explicit: "[W]e're

watching, and we're watching closely," and stated that the Department looked forward to providing public updates after its six-month review.  *Id.*

29.     Scouting America, in its public statements, appeared to describe a different agreement.  Its own national press release framed the Department announcement as a "renewed, strengthened partnership," made no mention of a memorandum of agreement, and did not say that Scouting America had agreed to mandatory birth-sex designations, birth-certificate matching, new facility-segregation rules, or the exclusion of transgender youth.  *See* Statement, Scouting America, *Scouting America Statement Concerning Department of War Announcement* (Feb. 27, 2026).[14]

30.     Scouting America's chief executive, Roger Krone, was more direct, telling Associated Press: "We have transgender people in our program, and we'll have transgender people in our program going forward."  *See* Ben Finley & Jamie Stengle, *Pentagon and Scouting America Reach Deal to Keep Ties after Hegseth's Anti-DEI Push*, Associated Press (Feb. 27, 2026).[15]  Krone also said that the gender-identity policies described by the Secretary largely reflected Scouting America's existing practice, as its applications already used boy-or-girl check boxes and communal activities were already sex-segregated.  *See id.*

31.     Public media coverage of this event largely hewed to the Department's account of the agreement.  Most outlets framed the agreement as a "capitulation" to the Department's demands.  Joe Eskenazi, *On the Eve of Iran War, the "Secretary of War" Fought with the Boy Scouts, He Didn't Win*, Mission Local (Mar. 9, 2026).[16]  One news outlet printed the headline,

---

[14] https://www.scoutingnewsroom.org/press-releases/scouting-america-statement-concerning-department-of-war-announcement.

[15] https://apnews.com/article/scouting-america-pentagon-military-boy-scouts-14a5fc1521fcd1e51103638f6f504214.

[16] https://missionlocal.org/2026/03/boy-scouts-pete-hegseth-scouting-america-dei.

"Scouting America to Reinstate Ban on Trans Children to Appease Pentagon."[17]  Another news outlet reported that the Department "had gotten [the] Scouts to cave, at the expense of [LGBTQ] young people whose presence in the organization will be discouraged," and that Scouting America was "now effectively in the Trump administration's pocket."  Hafiz Rashid, *Scouting America Caves to Hegseth, Ends DEI Efforts*, The New Republic (Feb. 27, 2026).[18]

32.    Other news coverage was more tempered.  *The Advocate* pointed out that the Department and Scouting America had issued contradictory public statements on the issue of transgender youth.  *See* Christopher Wiggins, *Scouting America Says Transgender Kids Are Still Welcome after Pete Hegseth Claimed They Weren't*, Advocate (Feb. 28, 2026).[19]  Other media outlets reported that the "actual concessions" made by Scouting America in the Memorandum "appear to have been relatively minor," Eskenazi, *supra*, and that it seemed the organization had "refused absolutely to cave on allowing girls into Scouting America, allowing trans and allowing gay members and leaders," NPR National Broadcast Transcript (Mar. 18, 2026).[20]

33.    The controversy has aroused substantial and sustained interest from both lawmakers and the general public.  In March, a bipartisan coalition of House members wrote to Secretary Hegseth, raising concerns with the Department's conduct and urging him to stop.[21]

34.    The precise scope of Scouting America's obligations remains a mystery.  Per one report, local scouting leaders have been "told by national leadership" that while "a formal

---

[17] *Scouting America to Reinstate Ban on Trans Children to Appease Pentagon, Says Pete Hegseth*, The Guardian (Feb. 27, 2026), https://www.theguardian.com/us-news/2026/feb/27/scouting-america-transgender-ban-pentagon.  A few days later, the headline was amended to attribute the announcement to Secretary Hegseth.  *See id.*

[18] https://newrepublic.com/post/207139/hegseth-pentagon-scouting-america-dei.

[19] https://www.advocate.com/politics/national/scouting-america-transgender-still-welcome.

[20] https://www.npr.org/transcripts/nx-s1-5750837.

[21] Letter from Reps. Suhas Subramanyam, Don Bacon, Sanford D. Bishop, Jr., Maggie Goodlander, Steven Horsford & James R. Walkinshaw, Members of Cong., to Pete Hegseth, Sec'y of Def. (Mar. 16, 2026); *see also* Press Release, Rep. Brian Fitzpatrick, Fitzpatrick Letter to Secretary Hegseth Regarding Scouting America (Feb. 9, 2026).

memorandum of understanding," exists, "not all the stuff Hegseth said is in it."  Eskenazi, *supra*.

Since the February announcement, the exact text of the Memorandum has yet to be disclosed,

either by the Department or otherwise.

35.     Meanwhile, implementation of the Memorandum has begun.  In February,

Scouting America discontinued the Citizenship in Society merit badge on or about February 27,

2026.  *See* Statement, Scouting America, *Citizenship in Society Merit Badge Discontinuance*.[22]

In May, Scouting America implemented a fee waiver for registration for military families.  *See*

Statement, Scouting America, *Scouting America Launches Military Family Fee Waiver to*

*Support Service Members and Their Families* (June 8, 2026).[23]

36.     Scouting America has also issued new guidance on personal space protections and

the use of facilities like restrooms, showers, changing areas, and sleeping accommodations.  That

guidance repeats the Department's admonition that Scouting America's facilities are to be

"assigned based on biological sex" and that the organization's "membership application includes

two sex designations: male and female," which "refer to biological sex at birth."  Safeguarding

Frequently Asked Questions (FAQs), Scouting America.[24]  But the new guidance appears to

reject the Secretary's enforcement mechanism.  The guidance states that it "does not require,

request, or verify" birth certificates or medical records, and that councils and units are "not

authorized to request or verify" such documentation.  *Id.*

37.     Implementation has also reached the membership application itself.  Scouting

America's Youth Application (Form 524-406), which had remained unchanged since July 2025,

---

[22] https://www.scouting.org/program-updates/citizenship-in-society-merit-badge-discontinuance.

[23] https://www.scoutingnewsroom.org/press-releases/scouting-america-launches-military-family-fee-waiver-to-support-service-members-and-their-families.

[24] https://pathwaytoadventure.org/wp-content/uploads/2026/03/Safeguarding-Standards-for-Privacy-and-Personal-Space.pdf (last accessed June 25, 2026).

was revised in or about May 2026.  The form's statement of who may join, which had welcomed "all eligible youth, regardless of gender, race, ethnic background, sexual orientation, or gender identification," was revised to delete the words "gender identification."  Youth Application (Form 524-406), Scouting America (rev. May 2026).[25]

38.    Scouting America has six months to comply with the terms of the Memorandum. In his announcement, Secretary Hegseth said that future federal support was contingent on Scouting America's "substantial progress" toward the Memorandum's terms, and that, at the six-month mark, the Department would "vigorously review progress and decide whether or not to continue our support."  Pete Hegseth (@SecWar), X (Feb. 27, 2026).  If so, then the Department's review will occur on or about August 27, 2026.

39.    As it stands, the Department's review will measure Scouting America against standards that have been withheld from the public.  Without disclosure of the exact contents of the Memorandum, the public does not know what Scouting America actually agreed to do, or what counts as "substantial progress" toward doing it.

40.    Disclosure of the Memorandum's contents is therefore most valuable right now, while the Department's six-month review remains pending and public criticism and commentary can still inform it.  Only contemporaneous disclosure of the Memorandum's contents will enable contemporaneous public scrutiny of the Department's conduct.

### *Plaintiff's FOIA Request*

41.    On March 24, 2026, Mr. Dale submitted a FOIA request to the Department through its online portal.  The request initially sought "a copy of the Memorandum of

---

[25] *Compare* Youth Application, Scouting America Form 524-406 (rev. May 2026), https://filestore.scouting.org/filestore/pdf/524-406.pdf*, with* Youth Application, Scouting America Form 524-406 (rev. July 2025), https://web.archive.org/web/20260414070229/http://filestore.scouting.org/filestore/pdf/524-406.pdf.

Understanding between the Department of Defense and Scouting America regarding membership policies, enrollment procedures, and any related implementation guidance," along with associated documents.

42.     The Department received the request on March 25, 2026, assigned it case number 26-F-1834, and routed it to the Office of the Secretary of War/Joint Staff FOIA Requester Service Center.

43.     On March 26, 2026, the Department issued an interim response stating that it would not be able to meet FOIA's twenty-working-day deadline.  The Department invoked "unusual circumstances" under 5 U.S.C. § 552(a)(6)(B), but did not identify which of the three statutory unusual circumstances applied, stating only that "[a]t least one, if not more of the scenarios applies or would likely apply to your request."

44.     The Department placed the request in its "complex processing queue," stating that the request would be "worked based on the order in which the request was received," and that the current queue contained "approximately 3,341 open requests."

45.     FOIA's twenty-working-day deadline expired on April 22, 2026.  Even assuming the Department validly extended its response deadline by ten additional working days, the extended deadline expired on May 6, 2026.  *See* 5 U.S.C. § 552(a)(6)(B)(i).  By that date, the Department had issued no substantive determination, invoked no statutory exemption, produced no records, and provided no definite completion date.  It has therefore constructively denied Mr. Dale's request.

46.     The Department's March 26 letter had suggested that Mr. Dale narrow his request, stating that "requesters who narrow the scope of their requests experience a reduction in the time needed to process their requests."  On May 6, 2026, Mr. Dale narrowed his request to

one record: the final, signed Memorandum.  The narrowing modified the pending request, and did not create a new request or restart the statutory clock.  *See* 5 U.S.C. § 552(a)(6)(B)(ii); 32 C.F.R. § 286.8(b), (c).

47.    On May 14, 2026, Mr. Dale timely filed an administrative appeal challenging the Department's constructive denial.  The Department acknowledged receipt of the appeal that same day, assigned it tracking number 26-A-1834-A1, and stated: "Due to an extremely heavy FOIA workload, we are unable to complete your appeal within the statutory time requirement."

48.    On May 22, 2026, the Department purported to resolve the administrative appeal by remanding the request to the same Freedom of Information Branch responsible for the initial default.  The remand was "for continued processing"; it did not grant or deny Mr. Dale's request, invoke any statutory exemption, or provide an estimated completion date.  The remand letter concluded: "If you are dissatisfied with [this] action on your appeal, the FOIA permits you to file a lawsuit in federal district court in accordance with 5 U.S.C. § 552(a)(4)(B)."

49.    As of the filing of this Complaint, the Department has not produced the Memorandum, issued a final determination, asserted any statutory exemption, or established any date certain for completion.  Mr. Dale's request remains in the same complex processing queue where the Department placed it on March 26, 2026.

50.    Mr. Dale has fully exhausted his administrative remedies.  *See* 5 U.S.C. § 552(a)(6)(C)(i).

51.    On June 9, 2026, Mr. Dale separately submitted a formal application for expedited processing of Request No. 26-F-1834, supported by a certified statement demonstrating a compelling public need.  The Department received the application the same day.

13

52.     By law, the Department was required to determine whether to grant expedited processing within ten days of the request.  *See* 5 U.S.C. § 552(a)(6)(E)(ii)(I).  That period expired on June 19, 2026.  The Department did not grant, deny, or otherwise determine that application within ten days after the date of the request, and as of the filing of this Complaint, the Department has not responded to the expedited-processing application.  It has thereby effectively denied expedited processing.

## COUNT I
### (Violation of FOIA, 5 U.S.C. § 552(a)(3), (a)(4)(B), (a)(6)—
### Improper Withholding of Agency Records)

53.     Mr. Dale incorporates the foregoing allegations.

54.     The Memorandum is an agency record subject to FOIA.

55.     After receiving Mr. Dale's request, the Department was required to determine within twenty working days whether it would comply, 5 U.S.C. § 552(a)(6)(A)(i), and to make nonexempt responsive records promptly available, 5 U.S.C. § 552(a)(3)(A).  The Department did neither.

56.     The Department made no determination by April 22, 2026, the twentieth working day after receipt, or by May 6, 2026, the latest possible date under a valid unusual-circumstances extension.

57.     The Department has identified no lawful basis for withholding the Memorandum and has invoked no statutory exemption.

58.     In its announcement, the Department described its terms and quoted liberally from it.  If the Department contends that any portion of the Memorandum is exempt from disclosure, FOIA requires release of all reasonably segregable nonexempt portions.  5 U.S.C. § 552(b).

59.     By failing to make a determination, failing to produce the Memorandum, and continuing to withhold it, the Department has violated FOIA and its implementing regulations. *See* 5 U.S.C. § 552(a)(3)(A), (a)(6)(A)—(B); 32 C.F.R. pt. 286.

60.     Mr. Dale is entitled to an order enjoining the Department from withholding the Memorandum and directing its prompt production, or, in the alternative, directing the Department to make a lawful determination and to produce all reasonably segregable nonexempt portions on a date certain set by the Court.  *See* 5 U.S.C. § 552(a)(4)(B).

## COUNT II
### (Violation of FOIA, 5 U.S.C. § 552(a)(6)(E)—
### Failure to Timely Determine Request for Expedited Processing)

61.     Mr. Dale incorporates the foregoing allegations.

62.     FOIA requires agencies to make a determination on any request for expedited processing "within 10 days after the date of the request," 5 U.S.C. § 552(a)(6)(E)(ii)(I), and the Department's regulations provide for expedited processing in circumstances including an urgency to inform the public concerning actual or alleged Federal Government activity, 32 C.F.R. § 286.8(e).

63.     Mr. Dale's June 9 application for expedited processing set forth the demonstrated public interest in the Memorandum, the time-sensitive need for disclosure, and Mr. Dale's entitlement to expedited processing.

64.     The Department did not grant, deny, or otherwise determine the application within the time required by FOIA.

65.     The Department's failure to make a timely determination is agency action subject to judicial review under 5 U.S.C. § 552(a)(6)(E)(iii).

15

66.     The Department has therefore violated 5 U.S.C. § 552(a)(6)(E)(ii)(I), and Mr. Dale is entitled to an order requiring the Department to process Request No. 26-F-1834 as soon as practicable or, at minimum, to make an immediate determination on his expedited-processing application and process the request on a court-ordered schedule.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Dale respectfully requests that this Court:

A.     Order the Department to produce the Memorandum to Mr. Dale forthwith, on a schedule calculated to permit meaningful public review before the Department's six-month review in August 2026, and in any event within twenty working days of the Court's order, releasing immediately all reasonably segregable nonexempt portions of any part of the record the Department contends is exempt;

B.     Declare that the Department violated FOIA by failing to make a timely determination on his request and by continuing to withhold the Memorandum;

C.     Order the Department to identify, by a date certain, every exemption it asserts as a basis for withholding any portion of the Memorandum; to file any justification for withholding by that date; and, as to any portion withheld, to produce a *Vaughn* index justifying each withholding by that date;

D.     Declare that the Department violated FOIA by failing to make a timely determination on Mr. Dale's expedited-processing application; order the Department to process Request No. 26-F-1834 as soon as practicable; and, in the alternative, order the Department to make an immediate determination on the application and process the request according to a schedule set by the Court;

E.     Order that the Department may not assess fees, *see* 5 U.S.C. § 552(a)(4)(A)(viii);

16

F.      Award Mr. Dale his reasonable attorney fees and other litigation costs reasonably

incurred in this action, *see* 5 U.S.C. § 552(a)(4)(E); and

G.      Grant such other and further relief as the Court may deem just and proper.

Dated: June 25, 2026                          Respectfully submitted,

                                  /s/ Isaac Park
                          Isaac Park (NY Bar No. 5708482)
                          Law Offices of Isaac Park, PLLC
                          767 Broadway #1752
                          New York, NY 10003
                          Phone: (646) 402-5902
                          isaac@parklaw.org

                          *Counsel for Plaintiff*